## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

DAMIEN DOUGLAS FREEMAN,

      Petitioner,

v.                            Case No. 8:20-cv-1432-WFJ-SPF

SECRETARY, DEPARTMENT
OF CORRECTIONS,

      Respondent.

_____/

## <u>ORDER</u>

Damien Douglas Freeman, a Florida prisoner, timely filed a *pro se* petition for writ of habeas corpus under 28 U.S.C. § 2254. (Doc. 1). Respondent filed a response opposing the petition. (Doc. 11). Mr. Freeman filed a reply. (Doc. 16). Upon consideration, the petition is **DENIED**.

## I.    Procedural History

A state-court jury convicted Mr. Freeman of attempted first-degree murder. (Doc. 11-2, Ex. 3). The trial court sentenced Mr. Freeman to life imprisonment as a prison releasee reoffender. (*Id.*, Ex. 4). The state appellate court *per curiam* affirmed the conviction and sentence. (*Id.*, Ex. 9). Mr. Freeman unsuccessfully sought postconviction relief under Florida Rule of Criminal Procedure 3.850, and the state appellate court *per curiam* affirmed the denial of relief. (*Id.*, Exs. 14, 15, 19, 22, 24, 26, 28). This federal habeas petition followed. (Doc. 1).

## II.      Facts; Trial Testimony

At approximately 3:45 a.m. on October 2, 2012, Denard Joe pulled his Dodge Challenger into the driveway of his parents' house in Lakeland, Florida. Mr. Joe parked his car under the carport, got out, and walked over to his other car (a Toyota Tercel), which he drove "to keep the miles off the Challenger." (Doc. 11-2, Ex. 2 at 308). Mr. Joe entered the Tercel and started the car.

Before he was able to pull out of the driveway, Mr. Joe noticed two men approaching him. The men were approximately ten feet apart from each other. Sensing that something was "out of place," Mr. Joe opened the driver's side door and began to exit his car. (*Id.* at 310). The man who was standing closer to Mr. Joe asked him for a light. Before Mr. Joe could answer, the man pulled out a gun and shot him in the chest. Mr. Joe took cover behind his father's truck, which was parked in the driveway. He then returned fire with his own weapon, a .45 caliber pistol. The man who had shot Mr. Joe fell in the roadway; Mr. Joe believed he had shot him.

Once the shooting stopped, Mr. Joe called out for his father and "ran to the front of the house." (*Id.* at 321). By this point, the two suspects had left the scene. Police and paramedics arrived, and Mr. Joe was taken to the hospital, where he stayed for twelve days. Mr. Joe suffered a collapsed lung and a broken rib. Police showed Mr. Joe three photographic lineups in the hospital, but he was unable to make an identification. After his discharge from the hospital, police presented him with a fourth photographic lineup. This

time, Mr. Joe identified Damien Freeman as the shooter with "100 percent" certainty.[1] (*Id.* at 338). Mr. Joe made the same identification at trial.

Law enforcement recovered several items from the crime scene. They found three .9mm shell casings on the roadway, as well as multiple .45 caliber shell casings on the driveway. Police also collected blood samples from a spot near the .9mm casings. At the time, the blood appeared to be "relatively fresh." (*Id.* at 152). Law enforcement subsequently obtained buccal swabs from Mr. Freeman. DNA analysis established that Mr. Freeman's buccal swabs were a "complete match" to the blood that was found near the .9mm casings. (*Id.* at 299).

Law enforcement also recovered a projectile from Mr. Joe's body. Jennifer Clark, a firearms analyst with the Florida Department of Law Enforcement, testified at trial that the projectile was "fired from a .38 caliber class firearm." (*Id.* at 396). She explained that the .38 caliber class encompasses "several different calibers," including a .9mm Luger, a .38 Special, and a .357 Magnum. (*Id.* at 396-97). Thus, Ms. Clark opined that it was "possible" the projectile was fired from a .9mm pistol, but she could not be sure. (*Id.* at 397). Crime scene technician Kim Patterson likewise testified that the projectile could have been fired from "a revolver" or a .9mm pistol. (*Id.* at 216).

Three months after the shooting, Ms. Patterson reviewed photographs of Mr. Freeman's left foot and chest. Ms. Patterson found a "small area on the top of [the left] foot that [was] consistent with what could be a projectile strike." (*Id.* at 156). She also noticed

---

[1] Mr. Joe testified at trial that he had never met Mr. Freeman before the shooting, and that he did not know why Mr. Freeman would want to kill him. The evidence at trial does not disclose a motive for the shooting.

a "suspicious area" on Mr. Freeman's chest, although she acknowledged that "[i]t could be just a basic scar." (*Id.* at 157).

## III.    Standards of Review

### A.    AEDPA

The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief can be granted only if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694; *see also Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.").

The state appellate court affirmed Mr. Freeman's conviction and sentence, as well as the denial of postconviction relief, without discussion. These decisions warrant deference under § 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore*, 278 F.3d 1245, 1254 (11th Cir. 2002). When a state appellate court issues a silent affirmance, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

## B.    Exhaustion of State Remedies; Procedural Default

A federal habeas petitioner must exhaust his claims in state court before presenting them in his federal habeas petition. 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."). The

exhaustion requirement is satisfied if the petitioner fairly presents his claim in each appropriate state court and alerts that court to the federal nature of the claim. *Picard v. Connor*, 404 U.S. 270, 275-76 (1971).

The doctrine of procedural default provides that "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). A fundamental miscarriage of justice occurs in an extraordinary case where a constitutional violation has probably resulted in the conviction of someone who is actually innocent. *Schlup v. Delo*, 513 U.S. 298, 327 (1995); *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003). To establish cause for a procedural default, a petitioner "must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). A petitioner demonstrates prejudice by showing that "there is at least a reasonable probability that the result of the proceeding would have been different" absent the constitutional violation. *Henderson*, 353 F.3d at 892.

## IV. Discussion

### A. Ground One—Failure to Rule on Pretrial Motions

Mr. Freeman contends that the trial court violated his Sixth and Fourteenth Amendment rights by "refus[ing] to rule on" his pretrial motions on the first day of trial. (Doc. 1 at 7). Mr. Freeman was charged by information on January 11, 2013, and was appointed counsel. (Doc. 11-2, Ex. 1). One month later, on February 14, 2013, Mr. Freeman

indicated that he wished to represent himself. The court conducted a *Faretta*[2] inquiry, found that Mr. Freeman was "knowingly and voluntarily waiv[ing] his right to counsel," and permitted him to proceed *pro se*. (*Id.*, Ex. 31 at 18-27). Soon after, on February 26, 2013, Mr. Freeman filed a "motion for speedy trial." (*Id.*, Ex. 32). The court granted the motion and set the trial for April 8, 2013. (*Id.*, Ex. 33).

Despite invoking his right to speedy trial, Mr. Freeman subsequently filed a motion to suppress evidence and a motion to compel discovery. (*Id.*, Exs. 34, 35). He did not, however, set the motions for a hearing. (*Id.*, Ex. 2 at 5-6). On the first day of trial, the prosecution informed the court that Mr. Freeman had submitted "a number of motions that . . . need to be addressed," including the motion to suppress, the motion to compel, and a motion to dismiss that Mr. Freeman had filed before demanding speedy trial. (*Id.* at 4). The court noted that the motions had not been "set for hearing and all [m]otions need to be set for hearing before a trial." (*Id.* at 5). The court then told Mr. Freeman that, if he wished to pursue the motions, the court would "set them for a date and they're going to take probably a half of a day to hear." (*Id.* at 6-7). The court made clear, however, that it would not "hear them on the morning of jury selection." (*Id.* at 7). The court therefore gave Mr. Freeman a choice: either proceed immediately to trial or agree to a continuance so that the court could entertain his motions at a later date.

Mr. Freeman stated that he was "100 percent" ready to go to trial, but he continued to insist that the court rule on his motions immediately. (*Id.* at 10-12). Mr. Freeman also

---

[2] *Faretta v. California*, 422 U.S. 806 (1975).

attempted to argue his motion to dismiss, claiming that the court "lack[ed] true subject matter jurisdiction to try and entertain [his] case because the prosecutor's office committed fraud upon the [c]ourt." (*Id.* at 11-12). The court denied the motion to dismiss, explaining that it had not "see[n] anything that indicates we don't have jurisdiction." (*Id.* at 12). The court declined, however, to hear Mr. Freeman's other motions, indicating that it would "proceed forward" with jury selection. (*Id.* at 13).

Mr. Freeman contends that the court violated his constitutional rights by "refus[ing] to rule on" his pretrial motions. (Doc. 1 at 7). According to Mr. Freeman, the court "force[d] [him] to pick one constitutional right over the other" by telling him that "if he wanted his pretrial motions [to be] heard, he had to waive his demand for speedy trial." (*Id.*) This claim fails because Mr. Freeman cannot show that the court unreasonably applied "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

In *Simmons v. United States*, the Supreme Court stated that it is "intolerable that one constitutional right should have to be surrendered in order to assert another." 390 U.S. 377, 394 (1968). *Simmons* held that "a defendant's testimony in a Fourth Amendment pretrial suppression hearing cannot be admitted in trial without violating the Fifth Amendment privilege against self-incrimination." *United States v. Snipes*, 611 F.3d 855, 866 (11th Cir. 2010) (citing *Simmons*, 390 U.S. at 394). "However, *Simmons* has never been extended beyond its context." *Id.* Indeed, three years after *Simmons*, the Supreme Court "questioned *Simmons*'s rationale of the 'intolerable tension' between constitutional rights, explaining that the application of this reasoning was "open to question." *Id.* (quoting *McGautha v.*

*California*, 402 U.S. 183, 212-13 (1971), *vacated in part on other grounds sub nom.*
*Crampton v. Ohio*, 408 U.S. 941 (1972)). The Supreme Court clarified that "the
Constitution does not . . . always forbid requiring [a defendant] to choose" between
competing rights, and that "[t]he threshold question is whether compelling the election
impairs to an appreciable extent any of the policies behind the rights involved." *McGautha*,
402 U.S. at 213.

The trial court did not force Mr. Freeman to forfeit any constitutional right. Mr.
Freeman was going to trial three months after the information was filed. That date was
chosen because Mr. Freeman had demanded a speedy trial. On the day jury selection was
scheduled to begin, the court gave Mr. Freeman the option of delaying the trial so that the
court could entertain his motions. Any such delay would have "merely result[ed] in a trial
that [was] less speedy." *United States v. Ashimi*, 932 F.2d 643, 648 (7th Cir. 1991). It would
not have "preclude[d] the possibility that the trial [could] satisfy the [S]ixth [A]mendment
(which, after all, guarantees only a *speedy* trial, not the *speedier* or the *speediest* trial)." *Id.*

Indeed, a petitioner cannot establish a speedy trial violation unless a "presumptively
prejudicial" period of delay occurred. *United States v. Register*, 182 F.3d 820, 827 (11th
Cir. 1999). "A delay is considered presumptively prejudicial as it approaches one year."
*United States v. Schlei*, 122 F.3d 944, 987 (11th Cir. 1997); *see also United States v.*
*Derose*, 74 F.3d 1177, 1185 (11th Cir. 1996) (holding that an "eight-month delay is
insufficient to merit a Sixth Amendment speedy trial violation inquiry"). Here, only three
months passed between the filing of the information and the date trial was set to begin. Mr.
Freeman does not argue that, had he agreed to a continuance, the court would have set a

trial date that "approache[d] one year" after the information was filed. *Schlei*, 122 F.3d at 987. Thus, there is no basis to conclude that a continuance would have caused a "presumptively prejudicial" delay. *See Stuard v. Stewart*, 401 F.3d 1064, 1068 (9th Cir. 2005) (holding that "[t]he constitutional right to a speedy trial was not even implicated in this case" because petitioner "was going to trial three months after the indictment, and had the power in his own hands to delay his trial for another month or two to give his lawyer more time to prepare").

Furthermore, Mr. Freeman bears at least some of the responsibility for the choice he faced on the first day of trial. Shortly before jury selection began, the court explained to Mr. Freeman that his motions had not been ruled on because he had failed to properly set them for a hearing. As the court noted, "filing them isn't enough[;] you've got to set them. . . . When you represent yourself you've got to still set the hearings." (Doc. 11-2, Ex. 2 at 6). Had Mr. Freeman set his motions for a hearing, the court may have been able to address them before the April 8, 2013 trial date. That, in turn, would have obviated the need for a continuance. *Cf. Collins v. Beltz*, No. 19-cv-2666-DSD-HB, 2020 WL 3104766, at *3-4 (D. Minn. May 29, 2020) (finding that habeas relief was unwarranted because petitioner "chose not to appear at his first omnibus hearing" and thus "bears at least some of the responsibility for any tension between his right to a speedy trial and his right to challenge the State's evidence"), 2020 WL 3104645 (D. Minn. June 11, 2020).

Simply put, Mr. Freeman has not shown that the court "force[d] [him] to pick one constitutional right over the other." (Doc. 1 at 7). Instead, he was merely "faced with a choice between giving up one advantage for another." *Stuard*, 401 F.3d at 1068. *Simmons*

"do[es] not entitle a defendant to obtain all possible advantages where giving up one is necessary to obtaining the other." *Id*. Ground One is denied.

### B.     Ground Two—Failure to Exclude Victim from Courtroom

Mr. Freeman contends that the trial court violated his Sixth and Fourteenth Amendment rights by declining to exclude the victim (Mr. Joe) from the courtroom while other witnesses testified. At the time of trial, the Florida constitution gave "[v]ictims of crime . . . the right to be . . . present . . . at all crucial stages of criminal proceedings, to the extent that th[is] right[] do[es] not interfere with the constitutional rights of the accused." *Booker v. State*, 773 So. 2d 1079, 1094 (Fla. 2000) (quoting Art. I, § 16(b), Fla. Const.). Based on this provision, the court allowed Mr. Joe to be present during other witnesses' testimony. (Doc. 11-2, Ex. 2 at 173-78). Mr. Freeman contends that Mr. Joe's presence at trial "colored his [] testimony" by allowing him to learn the location of Mr. Freeman's blood at the crime scene. (Doc. 1 at 9).

Mr. Freeman's claim "fails for one simple reason: A criminal defendant has no constitutional right to exclude witnesses from the courtroom." *United States v. Edwards*, 526 F.3d 747, 758 (11th Cir. 2008); *see also Bell v. Duckworth*, 861 F.2d 169, 170 (7th Cir. 1988) (Posner, J.) ("A refusal to exclude . . . witnesses until they testify is not a denial of due process. Separation or sequestration of witnesses . . . is a long-established and well-recognized measure designed to increase the likelihood that testimony will be candid. But the due process clause does not incorporate every refinement of legal procedure designed to make trials fairer or more accurate—not even one hallowed by time." (citations omitted)). Thus, Mr. Freeman cannot show that the decision to allow Mr. Joe to be present

during other witnesses' testimony was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Ground Two is denied.

### C.    Grounds Three, Four, and Six—Evidentiary Rulings

Mr. Freeman challenges several of the trial court's evidentiary rulings. In Ground Three, he contends that the court erred in "preventing [him] from questioning [Mr. Joe] concerning the recorded interview [with law enforcement]" and in limiting his impeachment of Mr. Joe. (Doc. 1 at 10). In Ground Four, Mr. Freeman argues that the court erred when it refused to allow him to recall Mr. Joe for additional cross-examination. (*Id.* at 12). And in Ground Six, Mr. Freeman argues that the trial court "abused its discretion" by allowing the prosecution to introduce a photograph of his chest, which showed a tattoo that read, "Thug Life." (*Id.* at 15).

Respondent contends that these claims are procedurally defaulted because Mr. Freeman failed to properly exhaust them in state court. The Court need not decide this issue because, even assuming that the claims were exhausted, they would fail on the merits. *See Dallas v. Warden*, 964 F.3d 1285, 1307 (11th Cir. 2020) ("[A] federal court may skip over the procedural default analysis if a claim would fail on the merits in any event.").

"[F]ederal courts will not generally review state trial courts' evidentiary determinations." *Taylor v. Sec'y, Fla. Dep't of Corr.*, 760 F.3d 1284, 1295 (11th Cir. 2014). "Indeed, in a habeas corpus action brought by a state prisoner, [the court's] authority is severely restricted in the review of state evidentiary rulings." *Id.* "Habeas relief is warranted only when the error so infused the trial with unfairness as to deny due process

of law." *Id.*; *see also Mills v. Singletary*, 161 F.3d 1273, 1289 (11th Cir. 1998) ("We will not grant federal habeas corpus relief based on an evidentiary ruling unless the ruling affects the fundamental fairness of the trial."). "Fundamental fairness is violated when the evidence excluded is material in the sense of a crucial, critical, highly significant factor." *Demps v. Wainwright*, 805 F.2d 1426, 1430 (11th Cir. 1986).

Mr. Freeman has not shown that any of the challenged evidentiary rulings "so infused the trial with unfairness as to deny due process of law." *Taylor*, 760 F.3d at 1295. First, Mr. Freeman argues that the trial court erroneously barred him from impeaching the victim (Mr. Joe) with his prior statements to law enforcement. As a result, Mr. Freeman was allegedly unable to establish that Mr. Joe "was testifying falsely to material facts," including that he "really didn't know which suspect shot him." (Doc. 1 at 10). In fact, however, Mr. Freeman was able to question Mr. Joe about the statements he made to law enforcement during his hospital stay:

> [Mr. Freeman]: Mr. Joe, did you ever testify that you don't know who shot you?
>
> [Mr. Joe]: I don't. I've never seen you a day in my life.
>
> [Mr. Freeman]: Did you testify that you don't know what suspect shot you?
>
> [Mr. Joe]: When I was—
>
> [Mr. Freeman]: Did—did you ever?
>
> The Court: Let him answer.
>
> [Mr. Joe]: When I was in the hospital and I was remembering the way things happened, yes, I said that.
>
> . . .

[Mr. Freeman]: Mr. Joe, at one point in time you stated you testified—you stated—did you—Mr. Joe, at one point in time you stated that the person that was closest to you who you are stating is me, that's what you're telling the jury, that me, you say that I shot you and then you at one point in time come to recant that testimony and say you don't know who shot you, either dude or the two people?

[Mr. Joe]: As I was telling the story, before I stated that the one that was closest to me shot me, I couldn't think at the time. I said I didn't know who it was. And I had to keep thinking about it.

(Doc. 11-2, Ex. 2 at 363-64).

Shortly after this exchange, Mr. Freeman attempted to impeach Mr. Joe with the transcript of his interview with law enforcement. During the interview, Mr. Joe had stated that he "wouldn't even know which one of them [*i.e.*, the two suspects] shot me." (*Id.* at 547-48). The prosecutor objected on the grounds that there was no "inconsistent statement." (*Id.* at 365). The court sustained the objection, noting that Mr. Freeman would "have a chance to ask th[e] officer some questions about the interview." (*Id.* at 366). That ruling was correct. Mr. Joe admitted on cross-examination that, during his initial interview with law enforcement, he had said he did not know which suspect shot him. Thus, there was no basis to impeach Mr. Joe with his prior statement to the police. *See Jennings v. State*, 512 So. 2d 169, 172 (Fla. 1987) (holding that "prior sworn statement of state witness" "could not be introduced for purposes of impeachment because [the witness] admitted that he had made the prior inconsistent statements").[3]

---

[3] Mr. Freeman also contends that the trial court prevented him from impeaching Mr. Joe with his prior statements about (1) where the suspect fell after being shot and (2) where Mr. Joe was standing when he was shot. In fact, Mr. Freeman cross-examined Mr. Joe about both topics, (Doc. 11-2, Ex. 2 at 370-76), and Mr. Freeman has not shown that Mr. Joe was subject to impeachment on these matters.

Second, Mr. Freeman contends that the court erred in refusing to allow him to recall Mr. Joe for additional cross-examination. After the prosecution rested, Mr. Freeman indicated that he wished to recall Mr. Joe to "impeach him" with a prior statement in which Mr. Joe claimed, contrary to his trial testimony, that "he told the alleged suspect that he didn't have a light" before the suspect shot him. (Doc. 11-2, Ex. 2 at 559-60). Mr. Freeman also stated that he would "ask [Mr. Joe] a question" he had not "asked [] yet," but Mr. Freeman declined to state the question in Mr. Joe's hearing. (*Id.* at 560). The court denied Mr. Freeman's request to recall the victim, explaining that "all those issues have been fully explored." (*Id.*)

Mr. Freeman cannot show that this decision violated his right to due process. There is no basis to conclude that the testimony he wished to elicit was "material in the sense of a crucial, critical, highly significant factor." *Demps*, 805 F.2d at 1430. Furthermore, the court permitted Mr. Freeman to cross-examine Mr. Joe about a wide variety of topics. In addition to the issues discussed above, Mr. Freeman asked Mr. Joe about (1) alleged discrepancies between Mr. Freeman's physical appearance and the physical description of the suspect given by Mr. Joe; (2) Mr. Joe's ability to accurately identify the suspects in light of the length of the encounter and the lighting conditions on the street; and (3) alleged discrepancies between the location of the .45 shell casings and Mr. Joe's testimony about where he was standing when he returned fire. (*Id.* at 338-87). Because Mr. Freeman was allowed to extensively cross-examine Mr. Joe about a number of topics, the court's refusal

to recall Mr. Joe did not "affect[] the fundamental fairness of the trial." *Mills*, 161 F.3d at 1289.[4]

Third, Mr. Freeman argues that the court erroneously allowed the prosecution to introduce a "prejudicial photograph" of his chest. (Doc. 1 at 15). The photograph was prejudicial, according to Mr. Freeman, because his chest bore a tattoo that read, "Thug Life." (*Id.*) Mr. Freeman fails to show that the admission of this photograph "so infused the trial with unfairness as to deny due process of law." *Taylor*, 760 F.3d at 1295. The photograph was relevant because it showed a potential gunshot wound on Mr. Freeman's chest. (Doc. 11-2, Ex. 2 at 157). The prosecutor did not draw attention to the tattoo when the photograph was shown to the jury, nor did he mention it during closing argument. Accordingly, Mr. Freeman cannot show that "the error, if any, was of such magnitude as to deny [him] his right to a fair trial." *Futch v. Dugger*, 874 F.2d 1483, 1487 (11th Cir. 1989); *see also Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

For these reasons, Grounds Three, Four, and Six are denied.

---

[4] To the extent that Mr. Freeman contends the court violated his rights under the Confrontation Clause by limiting his ability to cross-examine Mr. Joe, that claim fails. "[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985). Mr. Freeman cannot show—as he must to establish a Confrontation Clause violation—that "[a] reasonable jury might have received a significantly different impression of [Mr. Joe's] credibility had [Mr. Freeman] been permitted to pursue his proposed line of cross-examination." *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986).

### D.     Ground Five—Failure to Hold *Richardson* Hearing

Mr. Freeman maintains that the trial court erroneously failed to conduct a *Richardson*[5] hearing when it learned that the prosecution had failed to provide him with "a copy of the photographic evidence" before trial. (Doc. 1 at 14). He further contends that the court erred in not allowing him to "see [the] photographs before they were introduced into [] evidence." (*Id.*) Under Florida law, "[o]nce the court has notice of a discovery violation, the court is obliged to conduct a *Richardson* hearing." *Chamberlain v. State*, 254 So. 3d 1027, 1031 (Fla. 4th DCA 2018). "If the court finds a discovery violation, it must determine whether it was willful or inadvertent, substantial or trivial, and whether the aggrieved party has suffered prejudice." *Id.*

After electing to proceed *pro se* and demanding a speedy trial, Mr. Freeman filed a motion to compel discovery. (Doc. 11-2, Ex. 35). In his motion, Mr. Freeman stated that the discovery he had received from the "P.D. Office" was incomplete because, among other things, "there [were] no photograph[s] [] in it." (*Id.* at 1). Mr. Freeman failed to set the motion for a hearing, so the trial court did not have an opportunity to address the alleged discovery violation before trial. Nevertheless, on the day jury selection was scheduled to begin, the court gave Mr. Freeman the option of delaying the trial so that the court could entertain his pretrial motions, including the motion to compel. As explained above, Mr. Freeman refused the offer of a continuance, and the court proceeded with *voir dire*.

---

[5] *Richardson v. State*, 246 So. 2d 771 (Fla. 1971).

Shortly before opening statements, the issue of the photographs came up again. Mr. Freeman asked the court whether he could review the photographs that the prosecution intended to introduce during its case. The court stated that Mr. Freeman could view them "as they [were] introduced." (Doc. 11-2, Ex. 2 at 98). Mr. Freeman contends that, because he placed the court on notice of a "discovery violation" concerning photographic evidence, the court was required to conduct a *Richardson* hearing and allow him to view the photographs before they were introduced at trial. (Doc. 1 at 14).

This claim is not cognizable on federal habeas review. "[F]ederal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). "Whether a *Richardson* hearing should be held is a matter that only implicates state law." *Mingo v. Dixon*, No. 21-cv-60263-RAR, 2022 WL 2208918, at *4 (S.D. Fla. June 21, 2022). Likewise, whether the court should have allowed Mr. Freeman to review the photographs before they were admitted "is a matter of state law." *Thompson v. Jones*, No. 15-23614-CIV, 2017 WL 11461015, at *24 (S.D. Fla. Mar. 29, 2017), *adopted by* 2017 WL 11460995 (S.D. Fla. Dec. 7, 2017). As a result, "[t]he Court cannot grant habeas relief on this issue, even if the state court erred in some way." *Mingo*, 2022 WL 2208918, at *4; *see also Coleman v. Jones*, No. 1:16-cv-53-WTH-CAS, 2018 WL 1278759, at *1 (N.D. Fla. Mar. 12, 2018) ("[T]he alleged error in the state trial court by not conducting a *Richardson* hearing constitutes a state law issue and is not a cognizable basis for relief in federal habeas proceedings."). Moreover, although Mr. Freeman asserts that the court violated his right to due process, "he is merely attempting to transform this ground from a misinterpretation of state law claim to a federal due process claim." *Perkins v. Tucker*, No.

12-80199-CIV, 2012 WL 3614392, at *14 (S.D. Fla. Aug. 1, 2012), *adopted by* 2012 WL 3614384 (S.D. Fla. Aug. 21, 2012). Mr. Freeman cannot obtain federal habeas relief simply "by mentioning due process while attempting to gain relief from a state court's interpretation of state law." *Id.*

Even if this claim were cognizable, Mr. Freeman would not be entitled to relief. Under Florida law, the "remedy of a recess" has "been recognized as a generally fitting remedy for situations involving late disclosure" of evidence. *Bryant v. State*, 186 So. 3d 25, 33 (Fla. 4th DCA 2016) (collecting cases); *see also Hernandez v. State*, 572 So. 2d 969, 971 (Fla. 3d DCA 1990) ("[P]rejudice [from a discovery violation] may be averted through the simple expedient of a recess to permit the questioning or deposition of witnesses."). The trial court gave Mr. Freeman the option of continuing the trial so that it could address his outstanding motions, including the motion to compel production of the State's photographic evidence. A continuance likely would have "cured any procedural prejudice to [Mr. Freeman] resulting from" the late disclosure of the photographs. *Bryant*, 186 So. 3d at 33. Nevertheless, Mr. Freeman declined the court's offer to delay the trial. In these circumstances, there is no basis to conclude that the court violated Mr. Freeman's constitutional rights in its handling of the photographic evidence. Ground Five is denied.

### E.   Ground Seven—Allowing Prosecutor to "Seek[] Jury Sympathy"

Mr. Freeman argues that the trial court "committed fundamental error" by allowing the prosecution to "seek[] jury sympathy" during its rebuttal closing argument. (Doc. 1 at 16). Mr. Freeman objects to the italicized portion of the argument below:

[Prosecutor]: Ladies and gentlemen, the state has proved this case beyond a reasonable doubt; not 100 percent, as the defendant was telling you, and not beyond [] all doubt, the shadow of a doubt, beyond a possibility. You know, and the judge will read that. I'm not going to read it. I'll leave that to the judge and the way he's going to explain it to you and he's going to do a good job. The test is beyond a reasonable doubt.

*The common sense standard, you got the victim. He's shot. The evidence corroborates his testimony. It corroborates his story. The story he's given these officers, he's got a chest wound—a tube in his chest sucking blood out so he doesn't drown in his blood here.*

(Doc. 11-2, Ex. 2 at 639-40 (emphasis added)).

"The reversal of a conviction or a sentence is warranted when improper comments by a prosecutor have so infected the trial with unfairness as to make the resulting conviction [or sentence] a denial of due process." *Parker v. Head*, 244 F.3d 831, 838 (11th Cir. 2001). Thus, "[t]o find prosecutorial misconduct, a two-pronged test must be met: (1) the remarks must be improper, and (2) the remarks must prejudicially affect the substantial rights of the defendant." *United States v. Eyster*, 948 F.2d 1196, 1206 (11th Cir. 1991). During closing argument, "[a] prosecutor is not limited to a bare recitation of the facts, but instead, may comment on the evidence and express the conclusions he contends the jury should draw from the evidence." *Crenshaw v. Sec'y, Fla. Dep't of Corr.*, No. 16-17735-D, 2017 WL 6761058, at *6 (11th Cir. Oct. 18, 2017) (citing *United States v. Johns*, 734 F.2d 657, 663 (11th Cir. 1984)). Moreover, the prosecutor, "as an advocate, is entitled to make a fair response to the arguments of defense counsel." *Holland v. Florida*, 775 F.3d 1294, 1318 (11th Cir. 2014).

Here, the challenged remarks were not improper. During closing argument, Mr. Freeman repeatedly asserted that Mr. Joe was not a credible witness because he had made

statements to law enforcement that were inconsistent with his trial testimony. (Doc. 11-2, Ex. 2 at 618-21, 627-29, 632-33). In response, the prosecutor acknowledged that Mr. Joe "had some inconsistencies," but asked the jury to consider that when he spoke to law enforcement, Mr. Joe had just been "shot in the chest"—"a tough situation to be giving a statement to the police." (*Id.* at 637). The prosecutor repeated the point later, stating that Mr. Joe had "a tube in his chest sucking out blood" when he was telling his "story" to law enforcement. (*Id.* at 640). In context, therefore, it is clear that the prosecutor made the challenged remarks in response to Mr. Freeman's attack on Mr. Joe's credibility. Where, as here, a "prosecutor's comments are an invited reply in response to [a defendant's] remarks, and he does no more than respond substantially in order to right the scale, such comments would not warrant reversing a conviction." *United States v. Young*, 470 U.S. 1, 11-13 (1985). Ground Seven is denied.

### F.    Ground Eight—Improper Burden Shifting

Mr. Freeman contends that the prosecutor violated his rights to due process and a fair trial by "switch[ing] the burden of proof" during rebuttal closing argument. (Doc. 1 at 18). During his closing argument, Mr. Freeman made the following remarks:

> Now, the State of Florida told y'all in opening argument that I got shot. I got shot in the foot. And they got my DNA off the scene. From the start, I never denied the fact that my blood was on the ground. I made—I made that statement in my opening argument. Just because my DNA was on the ground doesn't make me guilty of nothing. And it don't. And just because Mr. [Joe] says something, don't make it true.

(Doc. 11-2, Ex. 2 at 608-09). In his rebuttal closing argument, the prosecutor used Mr. Freeman's admission to bolster the State's case:

> What makes the vic's word the gospel? The evidence, ladies and gentlemen. The evidence does. And then he testified I'm not disputing my DNA is left at the scene of the crime in the form of blood right where the victim said that I fell as he's shooting at me. That's exactly what it does, ladies and gentlemen. It clearly proves the guilt.

(*Id.* at 639). According to Mr. Freeman, the prosecutor falsely claimed that he had "conceded his guilt," thereby shifting the burden of proof to him. (Doc. 1 at 18).

As an initial matter, the prosecutor did not state that Mr. Freeman "conceded his guilt." Instead, the prosecutor correctly pointed out that Mr. Freeman had conceded his DNA was "at the scene of the crime in the form of blood." (Doc. 11-2, Ex. 2 at 639). The prosecutor then argued that this concession "prove[d]" Mr. Freeman's guilt. (*Id.*) As noted above, "[a] prosecutor is not limited to a bare recitation of the facts, but instead, may comment on the evidence and express the conclusions he contends the jury should draw from the evidence." *Crenshaw*, 2017 WL 6761058, at *6. The challenged remarks merely urged the jury to draw a reasonable inference from the evidence presented at trial. *See United States v. Reeves*, 742 F.3d 487, 505 (11th Cir. 2014) ("The purpose of closing argument is to assist the jury in analyzing the evidence, and although a prosecutor may not exceed the evidence presented at trial during her closing argument, she may state conclusions drawn from the trial evidence.").

Regardless, the prosecutor's remarks did not shift the burden of proof. During closing arguments, "prosecutors must refrain from making burden-shifting arguments which suggest that the defendant has an obligation to produce any evidence or to prove innocence." *United States v. Simon*, 964 F.2d 1082, 1086 (11th Cir. 1992). Here, however, the prosecutor simply (1) noted Mr. Freeman's admission that his DNA was at the scene

of the crime, and (2) asked the jury to draw a reasonable inference from that concession. Nothing about the challenged statements suggested that Mr. Freeman had "an obligation to produce any evidence or to prove innocence." *Id.*

Even if the comments did shift the burden of proof, Mr. Freeman would not be entitled to relief. Following closing arguments, the court instructed the jury that (1) the prosecution had "the burden of proving [that] the crime with which [Mr. Freeman was] charged was committed and [that Mr. Freeman was] the person who committed the crime"; and (2) Mr. Freeman "was not required to present evidence or prove anything." (Doc. 11-2, Ex. 2 at 649). The Eleventh Circuit has made clear that any "prejudice from the comments of a prosecutor which may result in a shifting of the burden of proof can be cured by a court's instruction regarding the burden of proof." *Simon*, 964 F.2d at 1086. Ground Eight is denied.

### G.    Ground Nine—Judicial Bias

Mr. Freeman accuses the trial court of "stepping out of its neutral zone and becoming State's advocate." (Doc. 1 at 19). He claims that the court displayed its "partiality" toward the prosecution during an exchange that took place after the State rested. (*Id.*) Mr. Freeman stated on the record that he wished to call a law enforcement officer as a witness. He then asked whether the prosecutor had told the witness not to come to trial. The court instructed the prosecutor that he did not "have to answer" the question, then asked whether Mr. Freeman had provided the prosecutor with a witness list. (Doc. 11-2, Ex. 2 at 545). The prosecutor indicated that he had not received any "defense discovery disclosure and/or a witness list." (*Id.* at 546). The court then explained to Mr. Freeman that

23

the State was "not required to produce your witnesses for you. That is your job. So I'm not going to hold up the trial waiting for an officer who wasn't under subpoena by the [S]tate to arrive at the courthouse at this time. And that was your responsibility." (*Id.*)

"[T]he Due Process Clause clearly requires a fair trial in a fair tribunal, before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Bracy v. Gramley*, 520 U.S. 899, 904-05 (1997) (citation omitted). "The general rule is that bias sufficient to disqualify a judge must stem from extrajudicial sources, and must be focused against a party to the proceeding." *Hamm v. Members of Bd. of Regents of State of Fla.*, 708 F.2d 647, 651 (11th Cir. 1983) (citation omitted). "An exception to that rule is made when a judge's remarks in a judicial context demonstrate such pervasive bias and prejudice that it constitutes bias against a party." *Id.* "Neither a trial judge's comments on lack of evidence, rulings adverse to a party, nor friction between the court and counsel constitute pervasive bias." *Id.*; *see also Minchew v. McNeil*, No. 3:05-cv-272-LAC-EMT, 2008 WL 3471740, at *9 (N.D. Fla. Aug. 11, 2008) ("[B]oth Florida and Federal courts agree that adverse judicial rulings are not an appropriate basis for finding that an otherwise valid conviction should be reversed pursuant to a judicial bias claim." (collecting cases)).

Mr. Freeman fails to establish judicial bias. His claim boils down to a disagreement with the trial court's rulings concerning a potential law enforcement witness. That is insufficient to overcome the "presumption" of judicial impartiality. *Bracy*, 520 U.S. at 909; *see also Johnson v. Sec'y, Dep't of Corr.*, No. 6:16-cv-1673-RBD-GJK, 2018 WL 10561950, at *4 (M.D. Fla. Mar. 1, 2018) ("[I]t appears that [petitioner] reviewed the entire trial transcript and now points to each of the court's adverse rulings as indicia of partiality.

24

Neither adverse rulings nor impatient remarks are generally sufficient to overcome the presumption of judicial integrity. . . .”). Furthermore, the Court has carefully reviewed the entire trial transcript, and it discloses no basis to conclude that the trial court displayed “such pervasive bias and prejudice that it constitute[d] bias against” Mr. Freeman. *Hamm*, 708 F.2d at 651. This is simply “not a case in which the judge openly exhibited a partisan zeal for the [prosecution] or stepped down from the bench to assume the role of advocate” on behalf of the State. *Id.* Ground Nine is denied.

### H.     Ground Ten—Denial of Motion for Judgment of Acquittal

Mr. Freeman contends that the trial court violated his Sixth and Fourteenth Amendment rights “by denying [a] motion for judgment of acquittal, or any motion for [judgment of acquittal] [he] may file, after [the] State rested its case.” (Doc. 1 at 20). He also contends that the court “prevent[ed] him from filing” a motion for judgment of acquittal. (*Id.*)

This claim is meritless. After the prosecution rested, the court stated that it would “make the determination that there’s sufficient evidence . . . at this time to overcome any motion for judgment of acquittal.” (Doc. 11-2, Ex. 2 at 519-20). That decision was correct, and it did not violate Mr. Freeman’s due process rights. Under the Supreme Court’s decision in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), a court reviewing a due process challenge to the sufficiency of the evidence must evaluate whether, “after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” The *Jackson* standard must be applied “with explicit reference to the substantive elements of the

criminal offense as defined by state law." *Id.* at 324 n.16. Under *Jackson*, the prosecution does not have "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." *Id.* at 326. If the record contains facts supporting conflicting inferences, the jury is presumed to have "resolved any such conflicts in favor of the prosecution." *Id.*

Ample evidence supported Mr. Freeman's conviction for attempted first-degree murder. "The elements of attempted first-degree murder are (1) an act intending to cause death that went beyond just thinking or talking about it; (2) a premeditated design to kill; and (3) the commission of an act which would have resulted in the death of the victim except that someone prevented the defendant from killing the victim or the defendant failed to do so." *Moss v. State*, 270 So. 3d 559, 560 (Fla. 1st DCA 2019). The victim, Mr. Joe, testified that Mr. Freeman walked up to him in his driveway, asked him for a light, then shot him in the chest before he could answer. Following the incident, Mr. Joe identified Mr. Freeman as the shooter from a photographic lineup. Moreover, Mr. Freeman's DNA was found near three .9mm casings recovered from the scene of the crime. Based on this evidence, a "rational trier of fact could have found the essential elements of [attempted first-degree murder] beyond a reasonable doubt." *Jackson*, 443 U.S. at 319.

Mr. Freeman appears to contend that the trial court should have allowed him to present oral argument on the motion for judgment of acquittal. Mr. Freeman is correct that the court did not wait for him to make the motion. Instead, it preemptively ruled that the evidence was sufficient "to overcome any motion for judgment of acquittal." (Doc. 11-2, Ex. 2 at 520). But while the Supreme Court has recognized a constitutional right to present

closing argument, it has declined to "imply[] the existence of a constitutional right to oral argument at any other stage of the trial or appellate process." *Herring v. New York*, 422 U.S. 853, 863 n.13 (1975). Accordingly, the court did not violate Mr. Freeman's constitutional rights by ruling on the motion for judgment of acquittal without his input. In any event, Mr. Freeman offers no basis to conclude that, had he been allowed to argue the motion, the outcome would have been different. Ground Ten is denied.

## I.     Ground Eleven—Prosecution's Use of "Tampered" Evidence

Mr. Freeman contends that the prosecution violated his Sixth and Fourteenth Amendment rights by presenting "tampered[-]with photographs" at trial. (Doc. 1 at 21). According to Mr. Freeman, Mr. Joe falsely testified that he was "shot standing between [his] open car door." (*Id.*) Mr. Freeman asserts that, to "give credence" to this allegedly false statement, the prosecution presented photographs showing "an open car door" at the scene of the crime. (*Id.*) Other "discovery photographs," however, allegedly showed that when law enforcement arrived on the scene, the car door was closed. (*Id.*) Thus, Mr. Freeman infers that the photographs showing the "open car door" were "altered from [their] original condition." (*Id.*)

Respondent correctly contends that this claim is procedurally defaulted. Mr. Freeman raised the evidence-tampering argument for the first time on direct appeal. Indeed, in his initial brief, he acknowledged that he "did not object" at trial to the prosecution's

alleged tampering with photographic evidence.[6] (Doc. 11-2, Ex. 6 at 40). In its answer brief, the State argued that Mr. Freeman's claim was "unpreserved" because he did not "timely raise[]" the objection before the trial court. (*Id.*, Ex. 7 at 40). The state appellate court *per curiam* affirmed Mr. Freeman's conviction and sentence. (*Id.*, Ex. 9). This Court presumes that the *per curiam* affirmance of the judgment rested on the procedural bar asserted in the State's answer brief. *See Zeigler v. Crosby*, 345 F.3d 1300, 1310 (11th Cir. 2003) ("[W]hen a state court issues a summary denial on a claim that is procedurally barred and nothing in the disposition discusses the merits of the federal claim, we cannot assume that had the state court explained its reasoning, it would have reached the merits of the claim." (citing *Kight v. Singletary*, 50 F.3d 1539, 1545 (11th Cir. 1995))); *Tower v. Phillips*, 7 F.3d 206, 211 (11th Cir. 1993) ("[W]e may not assume that had the state court issued an opinion, it would have ignored its own procedural rules and reached the merits of the case."); *Bennett v. Fortner*, 863 F.2d 804, 807 (11th Cir. 1989) ("This circuit to a point has presumed that when a procedural default is asserted on appeal and the state appellate court has not clearly indicated that in affirming it is reaching the merits, the state court's opinion is based on the procedural default.").

The resolution of this claim on state procedural grounds resulted in a procedural default, and the claim is barred from federal habeas review unless Mr. Freeman establishes

---

[6] As discussed above, Mr. Freeman did object at trial to the prosecution's failure to turn over the photographs in discovery. But he did not argue to the trial court that the prosecution had tampered with the photographs of the open car door.

either cause and prejudice for the default or a fundamental miscarriage of justice. *Harris v. Reed*, 489 U.S. 255, 262 (1989). He has not done so.

Mr. Freeman apparently seeks to establish cause for the default by arguing that the State's "discovery violation"—its alleged failure to provide the photographs before trial—prevented him from timely objecting. (Doc. 16 at 18). Even if Mr. Freeman could establish cause for the default, he has not shown prejudice. Setting aside the photographs of the open car door, the prosecution presented overwhelming evidence of Mr. Freeman's guilt. Accordingly, there is no "reasonable probability that the result of the proceeding would have been different" had the State not introduced the challenged photographs. *Henderson*, 353 F.3d at 892; *see also Smith v. Warden, Macon State Prison*, 803 F. App'x 272, 281 (11th Cir. 2020) (holding that, "[e]ven if [petitioner] could establish cause for his procedural default, he [could] not show[] actual prejudice" from the alleged constitutional violation in light of "the overwhelming evidence of [his] guilt"); *McCoy v. Newsome*, 953 F.2d 1252, 1261 (11th Cir. 1992) ("A mere possibility of actual prejudice resulting from an error at trial will not waive the procedural default bar where other substantial evidence of guilt is present.").

Thus, Ground Eleven is denied.

### J.    Ground Twelve—Denial of Claim of Newly Discovered Evidence

Mr. Freeman contends that the state postconviction court erred in denying his claim of "newly discovered evidence." (Doc. 1 at 22). This claim rests on a report prepared by forensic expert Joshua Wright in March 2018, five years after trial. (Doc. 11-2, Ex. 11 at 108). Mr. Freeman retained Mr. Wright to evaluate whether the .38 caliber class bullet

recovered from Mr. Joe's body "could have come from" any of the .9mm shell casings found at the crime scene. (*Id.* at 109). In his report, Mr. Wright opined that "[a]ll indications point to [the recovered bullet] being a [.]38 Special or [.]357 Magnum caliber bullet that was fired from a revolver." (*Id.* at 111). Mr. Wright acknowledged that Jennifer Clark, the State's firearms expert, had testified that the bullet "could possibly have come from one of the" .9mm casings. (*Id.* at 112). Mr. Wright disagreed with that conclusion based on "the style of the bullet, the weight, diameter, general rifling characteristics, etc." (*Id.*) In his state postconviction motion, Mr. Freeman argued that had Mr. Wright's report been presented at trial, the jury would have acquitted him. (*Id.* at 24).

The state postconviction court rejected Mr. Freeman's claim of newly discovered evidence. (*Id.*, Ex. 14 at 299). The denial of that claim presents no basis for federal habeas relief. Under Florida law, a defendant may "obtain a new trial based on newly discovered evidence" if he "meet[s] two requirements": (1) "the evidence must not have been known by the trial court, the party, or counsel at the time of trial, and it must appear that the defendant or defense counsel could not have known of it by the use of diligence"; and (2) "the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial." *Taylor v. State*, 260 So. 3d 151, 158 (Fla. 2018). Federal habeas law is different, however. It is well established that, "at least in non-capital cases," a federal court cannot "grant[] habeas relief based upon a claim of actual innocence." *Jordan v. Sec'y, Dep't of Corr.*, 485 F.3d 1351, 1356 (11th Cir. 2007). Thus, "[f]ederal habeas relief is not warranted for claims premised on newly discovered evidence because they do not

present cognizable federal constitutional claims." *Jones v. Sec'y, DOC*, No. 2:08-cv-625-JES-SPC, 2011 WL 4435079, at *16 (M.D. Fla. Sept. 23, 2011) (collecting cases).

Mr. Freeman separately contends that the state court ignored the *Brady*[7] and *Giglio*[8] arguments embedded in his claim of newly discovered evidence. The state court rejected all of Mr. Freeman's claims, but it did not expressly address the *Brady* and *Giglio* arguments based on Mr. Wright's report. "When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits—but that presumption can in some limited circumstances be rebutted." *Johnson v. Williams*, 568 U.S. 289, 301 (2013). The presumption is rebutted when the evidence clearly shows that the state court "inadvertently overlooked" the federal claim. *Bester v. Warden*, 836 F.3d 1331, 1336 (11th Cir. 2016). In such a case, federal courts review the claim *de novo*. *Id.* at 1337.

Here, even assuming that *de novo* review applies, Mr. Freeman has not shown that he is entitled to relief. *See Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010) ("Courts can . . . deny writs of habeas corpus under § 2254 by engaging in *de novo* review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on *de novo* review.").

In his state postconviction motion, Mr. Freeman argued that *Brady* was violated because "Mr. Wright's report [was] exculpatory in nature, and if available at trial would've

---

[7] *Brady v. Maryland*, 373 U.S. 83 (1963).

[8] *Giglio v. United States*, 405 U.S. 150 (1972).

impeached [Ms.] Clark's false and misleading testimony." (Doc. 11-2, Ex. 11 at 25). "To prevail on a *Brady* claim, the defendant must establish: (1) the evidence at issue is favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence was suppressed by the State, either willfully or inadvertently; and (3) the defendant incurred prejudice." *Wright v. Sec'y, Fla. Dep't of Corr.*, 761 F.3d 1256, 1278 (11th Cir. 2014). Mr. Freeman's *Brady* claim fails because the allegedly exculpatory material—Mr. Wright's report—was prepared five years after trial at Mr. Freeman's request. "[I]t is clear that there can be no suppression of evidence that does not exist at the time of trial or sentencing." *Burgess v. Terry*, 478 F. App'x 597, 600 (11th Cir. 2012).

The *Giglio* claim fares no better. "To establish a *Giglio* claim, a habeas petitioner must prove: (1) the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony; and (2) such use was material, i.e., that there is any reasonable likelihood that the false testimony could . . . have affected the judgment." *Guzman v. Sec'y, Dep't of Corr.*, 663 F.3d 1336, 1348 (11th Cir. 2011). In his state postconviction motion, Mr. Freeman argued that Mr. Wright's report showed that the "State Attorney allowed [Ms. Clark's allegedly false] testimony and failed to correct it." (Doc. 11-2, Ex. 11 at 12). To the contrary, Mr. Wright's report shows, at most, that "a second expert may disagree with [Ms. Clark's] opinions and conclusions." *Gary v. Schofield*, 336 F. Supp. 2d 1337, 1373 (M.D. Ga. 2004). "This alone does not prove that [Ms. Clark's] testimony was false or misleading; and it certainly does not prove the [p]rosecution knew, or should have known, of its falsity." *Id.*; *see also Davis v. Terry*, 465 F.3d 1249, 1254 (11th Cir. 2006) (rejecting *Giglio* claim based on subsequently recanted

testimony because the witness in question "did not present the affidavit recanting his testimony until well after the trial had ended, and no evidence ha[d] been presented to indicate that the State knew that his trial testimony was false").

For these reasons, Ground Twelve is denied.

### K.   Ground Thirteen—*Brady* and *Giglio* Claims Based on Ms. Clark's Testimony

In Ground Thirteen, Mr. Freeman raises an additional *Giglio* claim based on Ms. Clark's testimony. As noted above, Ms. Clark testified at trial that the projectile recovered from the victim's body was "fired from a .38 caliber class firearm." (Doc. 11-2, Ex. 2 at 396). She clarified that the .38 caliber class encompasses "several different calibers," including a .9mm Luger, a .38 Special, and a .357 Magnum. (*Id.* at 396-97). Ms. Clark ultimately opined that it was "possible" the projectile was fired from a .9mm pistol, but she could not be sure. (*Id.* at 397). Mr. Freeman contends that this testimony was false—and the prosecution knew it—because Ms. Clark's "case notes" provided a "precise caliber" for the bullet, "and it [was] a .38 caliber." (Doc. 1 at 24).

The state postconviction court rejected this claim, describing it as "conclusory in nature." (Doc. 11-2, Ex. 14 at 299). That conclusion was a reasonable application of *Giglio*. "[T]he suggestion that a statement may have been false is simply insufficient [to establish a *Giglio* violation]; the defendant must conclusively show that the statement was actually false." *Maharaj v. Sec'y for Dep't of Corr.*, 432 F.3d 1292, 1313 (11th Cir. 2005). Mr. Freeman has not done so here. Contrary to his assertion, the case notes did not provide a "precise caliber" for the bullet recovered from the victim's body. Instead, the notes stated

that the bullet belonged to the "[.]38 class." (Doc. 11-2, Ex. 11 at 73). That was fully consistent with Ms. Clark's testimony that the bullet was "fired from a .38 caliber class firearm," which she indicated could include a .9mm Luger. (*Id.*, Ex. 2 at 396-97).

Mr. Freeman also asserts a *Brady* claim based on the State's alleged suppression of Ms. Clark's case notes. He contends that the prosecution withheld the notes from him, and that the notes "could have been used to impeach" Ms. Clark and "exonerate" him because "the State built its entire case on the victim being shot with a .9mm." (Doc. 1 at 25-26). The state postconviction court reasonably rejected this claim. "*Brady* applies only when withheld information is favorable to the accused, either because it is exculpatory, or because it is impeaching." *Downs v. Sec'y, Fla. Dep't of Corr.*, 738 F.3d 240, 260 (11th Cir. 2013). Mr. Freeman contends that the case notes were exculpatory because they established that the victim "was not shot with a .9mm handgun." (Doc. 1 at 26). As explained above, however, the case notes did not rule out the possibility that the bullet recovered from the victim came from a .9mm pistol. Moreover, because Ms. Clark's testimony was consistent with her case notes, Mr. Freeman could not have used the notes to impeach her. *See Crowe v. Hall*, 490 F.3d 840, 846 (11th Cir. 2007) (rejecting *Brady* claim because, although defendant "argue[d] that the alleged *Brady* evidence would have impeached the sheriff's testimony about the third confession, [] that testimony was largely consistent with the contents of the reports").

For these reasons, Ground Thirteen is denied.

**L.      Ground Fourteen—*Giglio* Claim Based on Victim's Testimony**

Mr. Freeman argues that the prosecution committed a *Giglio* violation by allowing the victim (Mr. Joe) to testify falsely at trial. He points to the following alleged falsehoods from Mr. Joe's testimony: (1) Mr. Joe's identification of Mr. Freeman as the shooter, (2) Mr. Joe's statement that he was "between [the] open car door when he got shot," and (3) Mr. Joe's "misrepresent[ation] [of] the recorded interview he gave to police" on the morning of the shooting. (Doc. 1 at 28).

The state postconviction court rejected this claim:

> Defendant argues that the State committed a *Giglio* violation. Defendant claims that the victim, Denard Joe, testified falsely. The record refutes the Defendant's claim. Mr. Joe testified and previously stated that he was shot by a light skinned male who approached him and asked for a lighter. Mr. Joe specifically stated that the person who approached him was the one who shot him. Four total photo-paks were presented to [the victim]. The first three did not have the Defendant's picture and no identification was made of the Defendant. The fourth photo-pak had the Defendant's picture and the victim made a positive identification. A sketch artist prepared a sketch of the suspect based on the victim's description. Det. Stacy Pough testified that the Defendant and the person in the sketch were similar. Det. Pough also testified that Mr. Joe never made any inconsistent statements. The Defendant was permitted to cross examine the victim and Det. Pough regarding any alleged inconsistencies. The Court finds that a *Giglio* violation has not been established.

(Doc. 11-2, Ex. 12 at 122 (citations omitted)).

The state court reasonably rejected Mr. Freeman's *Giglio* claim. As noted above, "the suggestion that a statement may have been false is simply insufficient [to establish a *Giglio* violation]; the defendant must conclusively show that the statement was actually false." *Maharaj*, 432 F.3d at 1313. At best, Mr. Freeman points to a few minor inconsistencies in Mr. Joe's testimony. "The use of testimony that is inconsistent with a

witness's prior testimony . . . does not suffice to show that the proffered testimony was false." *United States v. Foskey*, 570 F. App'x 878, 881 (11th Cir. 2014); *see also Brown v. Crews*, No. 12-21909-CIV, 2013 WL 12453695, at *3 (S.D. Fla. Nov. 1, 2013) ("Mere inconsistencies are not sufficient to support a due-process violation under *Giglio*."). Because Mr. Freeman failed to show that Mr. Joe testified falsely, the state court reasonably rejected his *Giglio* claim. Ground Fourteen is denied.

### M.    Ground Fifteen—Failure to Recuse

Finally, Mr. Freeman argues that he was "denied due process of law" because the judge presiding over his state postconviction motion "refused to recuse himself" from the proceedings. (Doc. 1 at 31). Respondent contends that Mr. Freeman failed to exhaust Ground Fifteen, but the Court need not reach that issue because the claim is meritless. The Eleventh Circuit has made clear that, "while habeas relief is available to address defects in a criminal defendant's conviction and sentence, an alleged defect in a collateral proceeding does not state a basis for habeas relief." *Quince v. Crosby*, 360 F.3d 1259, 1262 (11th Cir. 2004). Accordingly, Mr. Freeman cannot obtain relief based on the state postconviction judge's refusal to recuse himself. *See id.* ("[T]he district court was correct in . . . declining to grant habeas relief based on Judge Johnson's refusal to recuse himself from the Rule 3.850 hearing."). Ground Fifteen is denied.[9]

---

[9] Mr. Freeman seeks an evidentiary hearing on his claims. An evidentiary hearing is not warranted. *See Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."); *Landers v. Warden*, 776 F.3d 1288, 1295 (11th Cir. 2015) ("[B]efore a habeas petitioner may be entitled to a federal evidentiary hearing on a claim that has been adjudicated by the state court, he must demonstrate a clearly established federal-law error or an unreasonable determination of fact on the part of the state court, based solely on the state court record.").

Accordingly, the Court **ORDERS**:

1. Mr. Freeman's petition (Doc. 1) is **DENIED**.

2. The **CLERK** is directed to enter judgment against Mr. Freeman and to **CLOSE** this case.

3. Mr. Freeman is not entitled to a certificate of appealability. A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To obtain a certificate of appealability, Mr. Freeman must show that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues he seeks to raise. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Mr. Freeman has not made the requisite showing. Because Mr. Freeman is not entitled to a certificate of appealability, he is not entitled to appeal *in forma pauperis*.

**DONE AND ORDERED** in Tampa, Florida, on June 13, 2023.

WILLIAM F. JUNG
UNITED STATES DISTRICT JUDGE